THE COUNTY OF ANDERSON v. HOUSTON AND GREAT NORTHERN RAILROAD COMPANY.

COUNTY BONDS IN AID OF RAILROADS—SPECIAL ELECTION—ACTION OF COUNTY COURT UPON RESULT OF ELECTION FINAL.— On the petition of fifty freeholders of Anderson county, an election was ordered by the County Court, and held in May, 1872, to take the sense of the voters on a proposition to issue county bonds as a donation in favor of a railroad. After the election the court made an order stating that the election had been held in pursuance of the order; that a special registration of voters had been made for the election in accordance with the statute; that more than two-thirds of the qualified voters of the county had voted for the proposition; that it was carried, and directing the issuance of the bonds on the complying with stipulations in the proposition. In January, 1873, the County Court issued to the road the bonds and levied a tax for that year and following years for their payment, which was paid until suit was brought to restrain the collection of the tax for causes stated in the opinion : *Held*—

1. The act of April 12, 1871, (Paschal's Dig., art. 7369,) adopted under the Constitution of 1869, made the County Court the judicial tribunal to determine the result of the election.

2. The validity of the election not having been questioned by the county officials, and the judgment of the County Court, pronouncing it to have been held in pursuance of its order, having been acted on for a period beyond that allowed by law for a *certiorari*, a bill of review, or a writ of error, was not subject to revision by the District Court.

3. It is not for the courts to impute improper motives to the Legislature in the enactment of the registration law, and the burden which may result from subsidies voted by those who were negligent in registering affords no ground for relief.

4. When the result of an election is by law to be ascertained and declared by any tribunal, the action of that tribunal is conclusive, unless it be impeached or sought to be reviewed in a direct proceeding instituted in time.

5. The District Court properly disregarded the allegations of fraudulent concealment so far as they related to the election and the official action of the managers and the County Court.

6. If citizens entitled to vote were deprived of that right, or illegal votes were received, though a direct proceeding might have been sustained to set the election aside, such facts did not render the election void, nor will they authorize the determination of its result to be collaterally attacked.

7. The County Court, in officially declaring that the company had fully complied with the terms of the proposition, prior to the issuance of the bonds, acted in their capacity of agents for the county, and after a tax had been levied and collected for their payment, it was no sufficient ground for canceling the bonds to allege a partial non-compliance by the railroad company with their proposition.

8. The court does not concur in the proposition that the statute under which the election was held and the bonds issued was in derogation of the power conferred on the County Courts to assess and provide for the collection of a tax "to aid in internal improvements." (Const. of 1869, art. 3, sec. 32.)

APPEAL from Anderson county. Tried below before the Hon. M. H. Bonner.

The opinion states the case.

*Word & Williams*, for appellant.

I. We submit that the act of the Legislature of May 13, 1871, requiring special registration, was unconstitutional and void, because it was judicial in its character, and directly de-

prived duly registered, qualified voters under the general registration law of their privilege and franchise without due course of the law of the land. It positively declares (section 5) that "Persons duly registered and holding certificates of special registration, issued under the provisions of this act, shall be deemed qualified voters, and it shall not be lawful for any person not so registered and holding such certificate of registration to vote upon a proposition at any election held under and by virtue of the provisions of the act of April 12, 1871," and the certificate was required to have the words "special registration" written across the face thereof in red ink.

There can be no question that this act directly disfranchised twenty-seven hundred qualified voters in Anderson county, and deprived them of the right and privilege of voting upon a question, the most important in its consequences ever submitted to them, perhaps, without due course of law, and a burden of over $300,000 was thereby imposed upon the taxpayers of the county by the vote of less than one-fourth of the qualified voters and tax-payers.

The right of persons in the elective franchise once acquired, has been elaborately and satisfactorily discussed by the Supreme Court of Tennessee, in the case of The State *v.* Staten, 6 Coldwell, 233; and Mr. Cooley, in a note at page 358 of his Constitutional Limitation, refers to the case of Davies *v.* Mc-Keeby, 5 Nev., 369, which we have not seen.

The Legislature could have altered, amended, or repealed the law of July 11, 1870, and could have enacted a new law on the subject, entirely changing the mode of ascertaining who were qualified voters under the Constitution, and authorizing them to exercise the franchise, but it could not deprive any voter of the right acquired under the repealed law, especially when that right had been awarded by the only tribunal that had jurisdiction of the subject-matter.

II. The right and privileges acquired under the repealed law could not be invalidated by the new law, which could only have been valid as a rule by which to adjudicate upon the

subsequent application of those who had not been awarded the elective franchise under any prior law.

The act of May 13, 1871, was "conceived in sin and born in iniquity." It was conceived by those interested in the subject-matter, and passed by a corrupt and alien Legislature, which did not represent the intelligent tax-paying people of the State, and at a time when over one-half of the people were under a cloud of political depression, so much so that many of them were so discouraged that it was difficult to get them to make any efforts at political reform, while the party whose legislators passed the act were thoroughly organized and drilled, and could be marched to the polls *in solido* at any election, and could be registered with equal facility. Its very object seems to have been, and its result has in fact been, to defraud and oppress the counties of this State through which railroads might pass.

III. But if the court should consider that said act was constitutional and binding, and authorized a special registration, and that none but those who had registered at said special registration could vote at the election on the question, still we submit that said election was fraudulent, and that two-thirds of the voters registered for said election did not vote for this proposition. This is the allegation. It is claimed that one thousand and eight voters were registered, and that seven hundred and sixteen of these voted for the proposition. It is alleged by appellant that one hundred of the votes cast for the proposition were fraudulent and had not been registered at said special registration, showing that only six hundred and sixteen of said specially-registered votes had been cast for the proposition, being fifty-six votes less than two-thirds of said special registration. The one hundred unregistered votes having been cast for the proposition, of course necessarily changed the result of the election, and hence the proposition was not carried. (Cooley's Const. Lim., 618; Trueheart *v.* Addicks, 2. Tex., 217; McKinney *v.* O'Connor, 26 Tex., 5.) The requisite number of votes not having been cast for the proposition, the

bonds could not be legally issued, and when issued were a nullity, even as to third persons, perhaps, and certainly as to the appellee, the party to the contract. The whole proceedings were made a matter of record under the requirements of the statutes, and the appellee, at its peril, was compelled to know the law and to see that its requirements were complied with. The records notified it that the requirements of the law had not been fulfilled, as one hundred persons not authorized by the statute had voted at the election. Every party dealing with a corporation must take notice of any want of authority which the public records would show. And parties dealing with the agents or officers of a corporation must, at their peril, take notice of the limits of the powers both of the corporation and of those assuming to act on its behalf. (Cooley's Const. Lim., 196; Swift *v.* Williamsburgh, 24 Barb., 427; State *v.* Kirkley, 29 Md., 95; Gould *v.* Sterling, 23 N. Y., 464; Clark *v.* Des Moines, 19 Iowa, 209; Veeder *v.* Lima, 19 Wis., 280; Dillon on Mun. Corp., 381; Duanesburgh *v.* Jenkins, 40 Barb., 574; 46 Id., 294; City of Atchison *v.* Butcher, 3 Kan., 104; City of Aurora *v.* West, 22 Ind., 88; People *ex rel. v.* Peck, 62 Barb., 545; People *ex rel. v.* Van Valkenburgh, 63 Barb., 105.)

IV. But it was insisted in the court below, that, first, the county was not a proper party to bring the suit; second, that the county was estopped by the action of the County Court issuing said bonds, that court having exclusive jurisdiction of the subject-matter, and the matters passed upon by that court being *res adjudicata,* and that it was, in fact, the county itself sitting in judgment; and third, that if there was any fraud in the issuance of said bonds, the county of Anderson was cognizant of and a party to said fraud, and cannot be heard to complain.

The counties of this State are public corporations, and may sue and be sued in their corporate capacity and name, the same as an individual may sue and be sued in his individual name and capacity. (Paschal's Dig., arts. 1044, 1045, 5933;

Watkins *v.* Walker County, 18 Tex., 585; Bell County *v.* Alexander, 22 Tex., 359.)   In fact, the counties can sue and be sued in no other manner, and it is made the duty of the County Court to "take and order suitable measures for prosecuting and defending all suits brought by or against" the counties.   (Paschal's Dig., arts. 1046, 6126; De la Garza *v.* Bexar County, 31 Tex., 485.)   This suit was properly ordered by the County Court of the county, and the record shows the fact.

V. Admitting, for the purposes of the argument, that the County Court had jurisdiction of the subject-matter, we submit, in discussing the point of estoppel or *res adjudicata*, that this suit is in the nature of a bill of review, or a bill to set aside the acts or orders of the County Court for fraud.   It is a direct proceeding, brought for the express purpose of annuling said bonds and the orders upon which they were issued, and the suit was brought in less than two years after the bonds were issued, and within less than one year from the discovery of the alleged fraud and illegality.   (Story's Eq. Pl., 403 *et seq.*)   Section 7 of article 5 of the Constitution of 1869, among other things, has the following provision in defining the jurisdiction of the District Court: "And the said courts, and the judges thereof, shall have power to issue the writ of *habeas corpus*, and all other writs necessary to enforce their own jurisdiction and to give them a general superintendence and control over inferior tribunals.   The District Court shall also have appellate jurisdiction in cases originating in the inferior courts, with such exceptions and under such regulations as the Legislature may prescribe."   The acts of April 12, 1871, and of May 13, 1871, provided no mode of appealing to the District Court from the proceedings of the County Court on the subject-matter.

We submit, then, that the only means by which the appellant could make available the appellate jurisdiction of the District Court over the inferior courts, given by the constitutional provision above quoted, was by an original bill bringing before the District Court all the acts and proceedings of

the County Court with the alleged fraud and illegality. (Mc-
Elroy *v.* Chancellor, 8 Tex., 270; Fitzhugh *v.* Orton, 12 Tex.,
4; Musgrove *v.* Chambers, 12 Tex., 32; Lively *v.* Bristow, 12
Tex., 60; Miller *v.* Hall, 12 Tex., 556; Fisk *v.* Wilson, 15
Tex., 430; Cannon *v.* Hendrick, 5 Tex., 339.) The Legisla-
ture not having provided a mode, cannot destroy the appel-
late jurisdiction given to the District Court by the Constitu-
tion, and where there is no mode of appeal by statute, the
court will adopt its own mode according to law. (Chevallier
*v.* Williams, 1 Tex., 177.)

VI. The District Courts have equity as well as common-
law jurisdiction; and if the District Court had not appellate
jurisdiction over the orders of the County Court, it had equity
jurisdiction to set aside said orders upon the ground of fraud.
It will hardly be denied that a judgment of a court of compe-
tent jurisdiction may be attacked and annulled for fraud, and
it is not deemed necessary to enter into an extensive discus-
sion to establish this proposition. (20 Tex., 579; 21 Tex.,
154, 367, 653; 24 Tex., 468; Story's Eq. Jur., 252; Kerr on
Fraud and Mistake, pp. 43, 44, 293, 294, 352, and notes and
authorities; Niles *v.* Anderson, 5 How., (Miss.,) 365; Christ-
mas *v.* Russell, 5 Wall., 290; Byers *v.* Surget, 19 How., 303.)

If, then, the District Court has either appellate or equitable
jurisdiction of the subject-matter on the ground of fraud, the
principle of *res adjudicata* cannot apply, and the appellant is
not estopped from inquiring into the matter. And here we
might suggest that estoppels are odious in law, and not al-
lowed in equity against the truth. (Blake *v.* Tucker, 12 Vt.,
44; 1 Greenl. Ev., 22, 204; 1 Serg. & R., 444.)

VII. Nor is the appellant bound by the recitals in the record
of the County Court. If there could be any question of this
as to courts of general jurisdiction, it cannot arise in the case
at bar; for it is submitted that the jurisdiction of the County
Court in issuing said bonds was peculiarly special and limit-
ed, and the record may be inquired into and contradicted.
(Cooley's Const. Lim., 406 *et seq.*)

VII. The County Court were the agents of the county for the express purpose of issuing said bonds, made so by law, without any action on the part of the appellant; and if said agents, either from ignorance or corruption, betrayed the high trust placed in them, and imposed a burden upon appellant without authority of law, appellant should not be bound by such action.

In whatever capacity the County Court may be considered to have acted in issuing said bonds, whatever relationship it may be considered as having borne to the county in its corporate capacity, there is no principle that would estop the county from being heard.

IX. We call the attention of the court to the appellant's allegations that appellee failed to comply with the terms of the proposition. It is charged that appellee, through its friends and agents, held out to the people and promised them that, if they would vote for the proposition, appellee would build a railroad from Palestine to the northern line of the county, within three years, according to the terms of the proposition, and that on this inducement the people voted for the proposition, and that appellee had failed and refused to build said road. It requires no argument to show the effect of such inducements on the voters, especially those living in the northern portion of the county, who would be particularly benefited by a railroad to that point, and appellee should not be allowed to take advantage of such an artifice. If the allegations of appellant on this point are true, certainly appellee has failed materially to carry out the contract and has acted in bad faith, and the court's attention is invited to the question. It is also alleged that appellee failed to build a depot according to the terms of the written contract, which is likewise a material failure to comply with the terms of the proposition.

X. It is believed that the court below erred in dissolving the injunction, first, because the affidavit to the answer was not sufficient. The affiant in the answer does not, of his personal knowledge, sufficiently deny the material allegations in appel-

lant's bill. (Burnley *v.* Cook, 13 Tex., 586; Smith *v.* Power, 2 Tex., 57.) Secondly, the injunction should not have been dissolved after the filing of the general demurrer. Thirdly, the allegation of appellee, that the bonds had been transferred to innocent holders, showed that appellee had no interest in the bonds, and therefore had no right to ask a dissolution of the injunction.

*Baker & Botts,* for appellee.

GOULD, ASSOCIATE JUSTICE.—This suit was brought by the county of Anderson, denying the validity of certain bonds issued by her constituted authorities in her name to the Houston and Great Northern Railroad Company, seeking to enjoin the transfer of the bonds and the further collection of a tax levied for their payment; praying, also, for the recovery back of payments made out of taxes previously collected, for the cancellation of the bonds, and, in an amended petition, praying, in case the bonds had been transferred to innocent holders, for judgment for the value thereof. The petition made exhibits of all the proceedings of the County Court of Anderson county in reference to said bonds. These proceedings show as follows:

On the 26th day of March, A. D. 1872, more than fifty freeholders petitioned the County Court of Anderson county to order an election to take the sense of the voters of said county on the question of donating $150,000 in the bonds of said county to the Houston and Great Northern Railroad Company, and an additional $50,000 in the bonds of said county to the first railroad company that would build a railroad from the town of Palestine to the northern line of said county, upon certain conditions. The conditions to be complied with by the Houston and Great Northern Railroad Company were, to build their railroad from the north boundary of Houston county to its intersection with the International Railroad at the town of Palestine, in said Anderson county, and build and maintain a depot of its said road within one-half mile of the court-house

in said town of Palestine, and commence to run their cars regularly thereto by or before the 1st day of July, 1873, the road to be of the same class and style with that portion of their road then built. The conditions of the $50,000 donation to the first railroad company constructing a railroad from Palestine to the northern line of said county were, that it should be of the same class as before required, and be built within three years from the adoption of the proposition.

The County Court accordingly ordered an election to be held on the 1st, 2d, 3d, and 4th days of May, A. D. 1872, for the purposes mentioned in the freeholders' petition. On the 6th day of May, A. D. 1872, the County Court made an order stating that the election had been held in pursuance of the previous order; that a special registration had been made for the purposes of said election, according to statute; that more than two-thirds of the qualified voters of Anderson county had voted for said proposition, and that it was carried; and further, that the county of Anderson would issue to the Houston and Great Northern Railroad Company, on completing their road to Palestine according to terms, $150,000 in the bonds of said county, and $50,000 to the first company that would build a road to the northern line of said county according to the proposition.

On the 29th day of January, A. D. 1873, upon the petition of said railroad company, the County Court, declaring that the Houston and Great Northern Railroad Company had fully complied with the terms of said proposition, issued to that company $150,000 in the bonds of said county, as of date December 31, A. D. 1872.

At the same time the County Court levied a tax of one per cent. on the taxable property in the county for the year 1873, and each successive year until all of said bonds are paid. The bonds were issued accordingly, one member of the County Court protesting. During the year 1873, and up to the institution of this suit, on November 14, 1874, the tax levied was collected and appropriated, as by law required, to the interest

and sinking-fund of these bonds.    The petition and amended petition deny that two-thirds of the qualified voters of Anderson county, either under the general or special registration, voted for the proposition, charging that there were about two thousand seven hundred registered and qualified voters in the county; that at the special registration for this election one thousand and eight registered, and claiming that less than two-thirds of these voted for the proposition; specifying various illegal and fraudulent acts of the managers of the election, and others in connection with the special registration list and election.    It denies the constitutionality of the special registration act of May 13, 1871, and the constitutionality of the act of April 12, 1871, authorizing aid to railroads, in so far as it attempted to authorize donations to railroads.    It alleges that the railroad company, by its president, had knowledge of the frauds in the election, and, in an amended petition, alleges combination between the company and members of the County Court.    It further alleges that the company, by its agents, pretended that if the proposition was carried it would also construct the road to the northern line of the county, thereby deceiving the voters, they having since constructed their road in a different direction.    Also charges a failure to erect a depot within one-half mile of the court-house.    It charges, also, that the tax levied was in excess of the amount required.

The court sustained general exceptions to the amended petition, having before sustained like exceptions to the previous pleadings of plaintiff.    The plaintiff declined to further amend, and the court having thereupon dismissed the case, this appeal is prosecuted.

The first question discussed by counsel is the constitutionality of the special registration statute of May 13, 1871.    (Paschal's Dig., art. 6805.)    This is not the first time that this question has been before this court.    In the case of The Texas and the Mississippi River, Canal, and Navigation Co. *v.* Galveston County, it was directly presented.    Justice Reeves, in the opinion delivered in that case, says: "There is nothing in the

Constitution to prohibit the Legislature from passing registration laws not inconsistent with its provisions. In the exercise of this right the Legislature enacted the law of May 31, requiring a special registration of voters, and declaring who should be considered qualified voters at any election held under the provisions of the act of April 12. To ascertain who were qualified voters, the registrar was required to make a special registration of the qualified voters, the registration to be conducted in accordance with the provisions of the act of July 11, 1870." After giving the purport of the fifth section of the act, he says: "This act confines the right to vote on a subsidy to those who have a certificate of special registration. The right to register applies to all who are otherwise qualified to vote." (45 Tex., 284.) The evident meaning of this language is, that the law was enacted by the Legislature in the exercise of its power to regulate registration by qualified voters, and was valid. It is true that the case was disposed of on a different point, but certainly the opinion of the court was expressed on the question now made. We are inclined to the same opinion, regarding it within the province of the Legislature, under a Constitution which required a voter to be duly registered, to prescribe such regulations in regard to repeated registration as it might deem wise, provided the constitutional right of the citizen to register and vote be neither denied nor unreasonably restricted. It is not for the courts to impute improper motives to the Legislature. They enacted a law which we must assume was designed to ascertain and determine the qualified voters of a county previous to an election, and under which a voter, qualified under the Constitution, could only lose his right to vote by his neglect to register. If citizens cease to be vigilant to secure their rights, the result may be that a Legislature which does not represent them enacts laws which they abhor, or that their more vigilant fellow-citizens vote for subsidies or other measures which they do not approve, and which burden them most grievously.

But whilst we entertain views which coincide with those ex-

pressed in the case in 45 Texas, it is believed to be unnecessary to decide the question of the constitutionality of the act under consideration.   If an election for county and State officers had been conducted under a similar statute, and the result of that election had been ascertained according to law, and the time prescribed by statute for a contest had been allowed to pass, the defeated candidate could not afterwards come into the courts and impeach the election as invalid because of the unconstitutionality of special registration.   However much he may have been entitled to the office had the election been conducted with reference to special registration, or however wrongful and illegal may have been some of the proceedings at the election, participated in, perhaps, by his opponent, the policy of the law requires that the result of the election be definitely ascertained, and unless contested in the time and manner prescribed, that it should afterwards remain undisturbed.   After years of acquiescence, the public good requires that the officer in whose favor the authorities intrusted by law with the determination of the result had decided, and who had been allowed thereupon to enter upon the discharge of his official duties, and to continue therein, shall not be disturbed.   Similar reasons would indicate the propriety of similar regulations in regard to such elections as those provided for in the act of April 12, 1871, entitled "An act to authorize cities and towns to aid in the construction of railroads and works of internal improvement."   (Paschal's Dig., art. 7369.) Section 1 of that act makes it the duty of the County Court, when petitioned by not less than fifty freeholders of the county, to order an election to take the opinion of the electors of the county on a proposition to aid a railroad, &c.

Section 2 reads: "The order of the court shall be entered on the minutes, and shall state the time when and the place where the election shall be held, and how long it shall continue, and shall appoint the managers to conduct the election, and name a time when they shall make a return thereof to the court."   This section directs how the proposition must

be stated in the order and the notice to be given of the election.

Section 3 provides a remedy for the failure of the managers to attend the election.

Section 4 directs how the vote shall be taken and who shall be allowed to vote, and requires a record to be kept of the names of all persons who vote, and then proceeds thus: "The managers shall count the votes and make a statement of the result, to which there shall be attached an affidavit of the managers and clerks that the election has been conducted according to law. And one of the managers shall, within three days after the election, make a return to the County Court of the result of the election, with the ballots and record of the persons who voted."

Section 5 reads: "A special meeting of the County Court shall be held on the first Monday after the return day of such election, when the court shall ascertain and record the result of the election, and if two-thirds of the qualified voters of the county shall have voted in favor of the proposition at such election, then it shall be the duty of the court to make such orders and adopt such regulations as will give practical effect to the proposition so voted for, and for that object the court shall have power to issue county bonds, to draw interest not exceeding ten per cent. per annum, and to levy a tax on all real and personal property situated in the county, not to exceed two per cent. on the assessed value of such property in any one year." The act contains eleven other sections regulating the form, issuance, and registration of the bonds; the levy and continuance of a tax sufficient to pay the assessed interest and not less than two per cent. of the principal of the bonds, and sundry other provisions which need not be stated.

The evident purport of the act is to make the County Court the tribunal to judicially determine the result of the election.

Under the Constitution and laws then in force, the County Court was composed of the five justices of the peace of the county, and was intrusted with powers of different kinds. In

some cases its power was clearly judicial; as, in trying contested elections for county officers. In other cases, as was said by this court in the case of Worsham *v.* Richards, "it is a sort of legislative body for the regulation of county affairs." (46 Tex., 441.) An undoubted example of their legislative power is in levying a tax. In yet another class of cases it acts as the agent or board of directors of the corporate body, the county; as, where, in behalf of the county, it makes contracts for the erection of public buildings.

In its judicial capacity, it was an appropriate tribunal to ascertain and record the result of the election. Speaking of this statute and of the County Court, this court has said: "A matter of great importance, involving judgment and discretion, is intrusted to its determination." (Austin *v.* Gulf, Colorado and S. F. R. R. Co., 45 Tex., 270.)

In that case a proposition to aid the railroad had been submitted to the voters of Galveston county on May 20, 1874, and the result had been ascertained and recorded by the County Court on June 15, 1874. In July, 1875, some of the bonds issued, a tax having been levied for their payment. On January 19, 1876, suit was brought to enjoin the collection of the tax and the further issuance of bonds, one of the grounds of relief being that two-thirds of the legal voters of the county had not voted for the proposition, and that, therefore, the county had no authority to issue the bonds or levy the tax. This court said: "Other objections are made to the action of the court in ascertaining and declaring the result of the election. If, however, we were to concede the most that can be claimed for them, it would be found that they were mere irregularities or errors in the course of a judicial proceeding, for which the judgment could not be impeached at the time and in the manner proposed by appellant in this case."

In the present case, it was more than two and a half years after the election, and after the determination of its result, when this suit was instituted, seeking to impeach the judgment and conclusion of the County Court.

Until the road had been constructed, it does not appear that the validity of the election was questioned by the county officials. Certainly the time to do so had passed when the determination of the County Court had been acted on for more than the period allowed for a *certiorari*, a bill of review, or a writ of error. If, in ascertaining and recording the result of the election, the County Court be regarded as a special tribunal, its action would certainly not be subject to revision by the District Court for a longer period than in ordinary litigated cases.

. In the final amended petition, plaintiff sought to excuse the delay by alleging fraudulent concealment of the wrongs complained of. In so far as this related to the election and the official action of the managers and the County Court, it is believed that the court was justified in disregarding the averment of concealment. The proposition, that if the result of such an election is by law to be ascertained and declared by any tribunal, the action of that tribunal is conclusive unless it be impeached or sought to be revised in a direct proceeding instituted in time, is supported by numerous decisions of the Supreme Court of the United States and other courts. (Commissioners of Knox Co. *v.* Aspinwall, 21 How., 544; Munson *v.* Town of Lyons, 12 Blatch., 545; Township of Rock Creek *v.* Strong, 96 U. S., 278; Marcy *v.* Township of Oswego, 92 U. S., 638; Town of Coloma *v.* Eaves, 92 U. S., 484; Railroad Co. *v.* City of Evansville, 15 Ind., 395; Railroad Co. *v.* Town of Chatham, 42 Conn., 465.)

It cannot be denied that the law authorized the submission of the proposition, nor that if the election was held in such a way as to deprive citizens entitled to vote of the right to do so, or if illegal votes were received or other irregularities committed, that these facts, however sufficient to have authorized the County Court to set the election aside, or to support a direct proceeding to revise the action of that court, do not make the election void, or authorize the determination of its result to be collaterally marked.

But the petition also alleged that the bonds had been issued wrongfully, because the company had failed to construct a road to the northern boundary of the county, and had failed to construct a depot according to the terms of the proposition. The exhibits attached to the petition show that the proposition imposed no obligation on the company to build a road to the northern line of the county. That proposition to aid any railroad was submitted in connection with the one to aid defendant. No question has been made as to the authority of the County Court thus to submit at one time propositions to aid different works. The propriety of such a submission need not be considered by us. The question is, Did the petition show a failure on the part of the company to construct a road which it had contracted to build to the northern line of the county? We are clearly of opinion that it did not.

The company did undertake, however, to build and maintain a depot within half a mile of the town of Palestine, and this was to be done before they were entitled to the bonds. In an amended petition, there is a distinct averment of the failure to build and maintain this depot. From the petition and exhibits it amply appears that, prior to the issuance of the bonds, the County Court officially declared that the company had fully complied with the terms of the proposition. In passing upon that question, our opinion is, that the County Court acted in their capacity as the agents of the county, intrusted with the management of its business affairs. As such agents, they represented the county for the purpose of inspecting the road and depot, and being satisfied that they had been constructed according to contract, they so declared and proceeded to issue the bonds. Not only so; the tax for their payment was levied by them, and was collected up to November, 1874, over twenty-one months after the bonds had issued. After such action of the county by its authorized agents, our opinion is, that it is not a sufficient ground for canceling the bonds to allege that, in fact, the compliance by the railroad had not been complete. It is only as affecting the validity of the

bonds that this partial failure on the part of the railroad is alleged. The relief sought is the cancellation of the bonds, or, if they have been transferred to innocent holders, the recovery of their value from the railroad. We repeat, that, after the action of the county by its agents, an allegation of a partial failure of the railroad in its contract shows no sufficient reason for annuling the entire issue of bonds, or for the recovery of the value of the entire issue.

If, after all that had passed, the question of failure on the part of the company to construct a depot was still open for any purpose, it was not open for the purpose of canceling the bonds, or of granting relief based on the ground that, if still in the hands of the company, they ought to be canceled. (County of Randolph *v.* Post, 93 U. S., 513; Commissioners *v.* Thayer, 94 U. S., 642; Leavenworth, Lawrence and Galveston Railroad Co. *v.* Douglas County, 18 Kan., 169; Louisville and Nashville Railroad *v.* State of Tennessee, 8 Heisk., 663.)

This suit was evidently brought mainly on the ground that the proposition submitted to the voters of Anderson county was never carried by the requisite majority, and that, therefore, there was no authority to issue the bonds,—a question which has been sufficiently disposed of. By amended petitions, other objections were made to the issue of the bonds. Donations to railroads, it is claimed, were authorized under the Constitution, and it is further claimed that the statute was in derogation of the power conferred by the Constitution on the County Courts to assess and provide for the collection of a tax "to aid in the construction of internal improvements." (Const., art. 12, sec. 32.) We content ourselves with saying that we have not been able to see that the law was unconstitutional. For these reasons, in our opinion, the exceptions to the petition were rightly sustained, and the judgment is affirmed.

AFFIRMED.

[Associate Justice BONNER did not sit in this case. Chief

Justice MOORE, when the court consisted of five judges, declined to sit, being a tax-payer in Anderson county, but after the bench was reduced to three, consented, at the request of both parties, to sit.]