PARKER et al. v. HARRIS COUNTY DRAINAGE DIST. NO. 2 et al.†

(Court of Civil Appeals of Texas. Galveston. April 5, 1912. Rehearing Denied May 2, 1912.)

1. APPEAL AND ERROR (§ 1002*)—REVIEW—FINDINGS—CONCLUSIVENESS.

It was for the jury in the trial court to decide a question of fact on which the evidence clearly conflicted.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3935–3937; Dec. Dig. § 1002.*]

2. DRAINS (§ 14*)—PROCEEDINGS TO ESTABLISH DISTRICT—SUFFICIENCY OF PETITION.

The petition for the establishment of a drainage district described the proposed district as beginning at the common corner of B., F., and H. counties; thence eastwardly along the line between B. and H. counties "to such a point on C. creek as will afford sufficient good drainage after crossing the track" of a railroad company named; thence northerly parallel with the railroad track "to the summit of the divide between S. bayou and B. bayou; thence westwardly along the summit of the divide, following the meanders of the same, to the line between H. and F. counties; thence southerly along said line to the beginning." The surveys in which most of A.'s lands lie abut on the railroad on the east, and the survey in which lie the remainder of his land included in the district adjoins the other surveys on the east, and it appeared that the first point on C. creek after crossing the railroad which afforded good drainage was many miles down the creek at a point from which a line running northwardly parallel with the railroad would be probably several miles east of A.'s land. *Held*, that the petition sufficiently described the boundaries of the proposed district so as to notify A. that his lands were included therein.

[Ed. Note.—For other cases, see Drains, Cent. Dig. §§ 5, 6; Dec. Dig. § 14.*]

3. DRAINS (§ 14*) — DRAINAGE DISTRICTS — BOUNDARIES—DESCRIPTION IN PETITION.

The petition for the establishment of a drainage district need only contain a sufficiently definite description of the boundaries of the proposed district to notify landowners therein that their lands are included.

[Ed. Note.—For other cases, see Drains, Cent. Dig. §§ 5, 6; Dec. Dig. § 14.*]

4. DRAINS (§ 14*)—PROCEEDINGS TO ESTABLISH DISTRICTS—NOTICE—SUFFICIENCY.

Pursuant to Acts 1907, c. 40, requiring notice of proceedings to establish a drainage district to be posted at the courthouse door of the county, and at four other "public places" within the district, notices were posted at the post office, the schoolhouse, and also at the depot, at the village of A., and one was posted at the schoolhouse and also at the depot at E. The town of A. is not incorporated, and about the time the district was organized there were only 4 residents within a mile of the town in every direction, but within a radius of two miles in every direction there were from 12,000 to 15,000. The schoolhouse and depot were about a half mile apart. The depot at E. is an old box car set up on the side of the railroad track, and the schoolhouse is about 150 yards west thereof, and the post office is about 200 yards east of the railroad track and depot. There is a store near the railroad, and five or six houses within a mile of the railroad station, and five or six more within a radius of two miles thereof; the town being merely a small country settlement. *Held*, that it could not be said that the notices were not posted so as to give reasonable notice to persons interested in the organization of the drainage district.

[Ed. Note.—For other cases, see Drains, Cent. Dig. §§ 5, 6; Dec. Dig. § 14.*]

5. DRAINS (§ 14*) — PROCEEDINGS—CONCLUSIVENESS.

Drainage Act 1907, c. 40, § 3, providing that the county commissioners' court "shall have exclusive jurisdiction to hear and determine all contests and objections to the creation of" a drainage district, "and all matters pertaining to the same, and said court shall have exclusive jurisdiction in all subsequent proceedings of the district when organized," gave the court exclusive jurisdiction to determine whether the petition for the district was void for not defining its boundaries, whether it was signed by the requisite number of qualified persons, whether notices of the proceedings had been properly published, and whether the boundaries of the district conformed to those described in the petition.

[Ed. Note.—For other cases, see Drains, Cent. Dig. §§ 5, 6; Dec. Dig. § 14.*]

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes
† Writ of error denied June 26, 1912, by Supreme Court.

6. DRAINS (§ 13*)—DRAINAGE DISTRICT—NATURE OF DISTRICT.

The drainage district organized under Drainage Act 1907, c. 40, is a public or quasi public corporation.

[Ed. Note.—For other cases, see Drains, Cent. Dig. § 4; Dec. Dig. § 13.*]

7. DRAINS (§ 14*)—CREATION OF DISTRICT—VALIDITY OF ORGANIZATION — COLLATERAL ATTACK.

When the law provides for the creation of a drainage district by any public body, as by the county commissioners' court, the validity of the district created by it cannot be collaterally attacked for failure to comply with the procedure prescribed, or for irregularities therein, but only directly by quo warranto.

[Ed. Note.—For other cases, see Drains, Cent. Dig. §§ 5, 6; Dec. Dig. § 14.*]

8. DRAINS (§ 14*) — DRAINAGE DISTRICTS — CURING IRREGULARITIES — CURATIVE STATUTES.

Acts 1909, c. 13, is entitled "An act to amend certain sections named of chapter 40 of the General Laws of the Thirtieth Legislature, validating certain proceedings and bonds heretofore issued and registered, providing for additional elections and issuance of bonds, election of drainage commissioners, etc., and section 1 provides that in all cases where drainage districts have heretofore been established or a hearing has been heretofore had on the petition and action taken, or wherein a public hearing is pending, the notices for such hearing, as well as for the hearing upon the engineer's report, are hereby deemed to have been legal and valid notices under the full meaning of the law. Held that, if the statute were constitutional, it cured all irregularities in posting notices of the organization of a drainage district under the statute amended by the curative act.

[Ed. Note.—For other cases, see Drains, Cent. Dig. §§ 5, 6; Dec. Dig. § 14.*]

9. STATUTES (§ 261*)—RETROACTIVE OPERATION.

The Legislature may give retrospectively the capacity which it could have given in the first instance, and may dispense retroactively with any statutory formality which it could have dispensed with in the first instance.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 342; Dec. Dig. § 261.*]

10. DRAINS (§ 2*) — CONSTITUTIONAL LAW (§ 289*)—DUE PROCESS OF LAW.

A statute, which authorized the creation of a drainage district without notice to the property owners affected, or, at most, with notice by posting at five public places in the district, did not violate the due process of law provisions of the state and federal Constitutions.

[Ed. Note.—For other cases, see Drains, Cent. Dig. § 17; Dec. Dig. § 2;* Constitutional Law, Cent. Dig. § 870; Dec. Dig. § 289.*]

11. STATUTES (§ 97*)—"SPECIAL LAW."

Acts 1909, c. 13, amended the drainage law of 1907, and section 1 provided that where drainage districts had been established, or where a hearing had been theretofore had on the petition, and action taken by the county commissioners' court, or where a public hearing was then pending, and the notices have been posted, the notices of the public hearing, as well as of the hearing on the engineer's report, provided for by section 10, should be deemed and declared legal notices of the public hearing. Acts 1911, c. 118, amending the Drainage Act 1907, provides that "in all drainage districts heretofore created, and which have issued and registered bonds with the comptroller," all proceedings done in connection with and leading up to the creation "of such districts" and the issuance of such bonds are hereby declared valid and legal. Held, that the statutes were not special laws within Const. art. 3, § 57, prescribing certain formalities in the passage of such laws.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 108, 109; Dec. Dig. § 97.*

For other definitions, see Words and Phrases, vol. 7, pp. 6577–6584; vol. 8, p. 7802.]

12. CONSTITUTIONAL LAW (§ 43*)—CONSTITUTIONAL PROVISIONS—ESTOPPEL TO RAISE.

If proceedings to establish a drainage district would deprive property owners of their property without due process of law, they could not be estopped from asserting that ground of invalidity by having failed to object to the organization of the district after having notice thereof.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 41; Dec. Dig. § 43.*]

Error to District Court, Harris County; Chas. E. Ashe, Judge.

Suit by J. C. Parker and others against the Harris County Drainage District No. 2 and others. Judgment for defendants, and plaintiffs bring error. Affirmed.

Hutcheson & Hutcheson, of Houston, for plaintiff in error. Wilson & Dabney, George B. Griggs, R. L. Whitehead, and L. R. Bryan, all of Houston, for defendant in error.

REESE, J. This action was instituted by J. C. Parker, W. H. Parker, Morgan (or J. M.) Davidson, and Sam Allen against Harris county drainage district No. 2, the commissioners of said district, and the county judge and members of the commissioners' court of Harris county, to enjoin the construction of drainage ditches and other works, in connection with said scheme of drainage, upon the lands of plaintiffs within the boundaries of said district, and also to restrain the levy and collection of the special drainage tax upon said lands. Upon trial with a jury the court instructed the jury, in substance, that plaintiffs J. C. Parker, W. H. Parker, and Morgan Davidson were not entitled to any relief, and that the verdict should be against them. The jury was further instructed to return a verdict against plaintiff Allen in so far as concerns the levy and collection of taxes upon his lands for the payment of his just and proportionate share of the first $35,000 of drainage bonds which had been issued and sold. Except as to this the jury was charged to return a verdict for Allen as to the relief prayed for by him, unless they found for defendants upon the issue of estoppel based upon his knowledge of the creation of the drainage district, including his lands, and the work being done, and his delay in the institution of this action. A special charge requested by defendants was given instructing the jury, in substance, that plaintiffs could not question in this suit the validity of the organization of the district, with the boundaries as shown, including the

lands of Allen, but that the sole issue submitted was whether he was entitled to an injunction restraining the drainage district from levying and collecting its taxes on said lands, or from doing any of the drainage work thereon. Under these instructions, the jury returned a verdict in favor of defendants against all of the plaintiffs. Judgment was thereupon rendered that plaintiffs take nothing by their plea and that defendants recover their costs. A motion for a new trial was made which was overruled, and the plaintiffs bring the cause to this court on writ of error.

The following facts are substantially alleged by the pleadings of the parties and were established by the undisputed evidence:

The drainage district referred to was created and organized by authority of the provisions of chapter 40, acts of the regular session of the Thirtieth Legislature (Acts 1907, p. 78), and as organized includes lands of each of the appellants. The lands of S. E. Allen so included are about 5,000 or 6,000 acres. The initial petition required by section 2 of the act was signed by 31 persons and was presented to the commissioners' court of Harris county on June 9, 1908. The petition contained the necessary and proper allegations required by the act. The boundaries of the proposed drainage district were given as follows: Beginning at the common corner of Brazoria, Harris, and Ft. Bend counties; thence eastwardly along the boundary line between Brazoria and Harris counties to such point on Clear creek as will afford sufficient good drainage to the district after crossing the track of the Gulf, Colorado & Santa Fé Railroad; thence in a northerly direction parallel with the said railroad track to the summit of the divide between Sims bayou and Brays bayou; thence westwardly along the divide, following the meanders of the same to the line between Harris and Ft. Bend counties; thence southeastwardly along said line to the beginning. This petition was presented to the commissioners' court on June 9, 1908, at a regular meeting of the court, and thereupon an order was made and entered by the court which, after reciting that it appeared to the court that the signers were taxpayers, that the petition was in conformity with the law, and that the necessary deposit required by the law had been made, set the same down for hearing on July 17, 1908, and ordered that the clerk cause to be posted five certified copies of the petition and the order, four within the boundaries of the district and one at the courthouse door of Harris county, in order that any person residing in the proposed district might appear and state his objections thereto. These notices were accordingly posted, one at the courthouse door, one at Almeda post office, one at the schoolhouse at Almeda, one at the schoolhouse at Erin, and one at the depot at Erin;

the return stating that the last four places were public places within the proposed district, which was also shown by the affidavit of the deputy clerk, who posted the notices.

On the day set for the hearing of the petition, at a meeting of the commissioners' court the following order was made: "On this the 17th day of July, A. D. 1908, came on for hearing before the court the petition of 31 resident citizens of the proposed drainage district to be known as Almeda drainage district of Harris county, Texas, and it appearing that due notice of said hearing has been posted by the clerk of this court for 30 full days preceding, as shown by his return on a certified copy of said petition and order of the court passed June 9, 1908, and the court having heard all the parties who appeared before it and gave their evidence thereon, and being of the opinion that the drainage in such district is feasible and practicable, and that it is needed, and that said drainage would be conducive to the public health and of benefit to the citizens of said community, on motion of Commissioner Hirsch, seconded by Commissioner Hare, the court so finds and directs that its findings be placed of record. It is further ordered that George F. Horton, a competent civil engineer of Harris county, be and he is hereby appointed to proceed immediately upon the premises described in said petition, and the land embraced therein, and examine the same and locate the necessary canals, drainage ditches, etc., and make an estimate of the probable cost to make and complete each of them, and designate the streams and bayous necessary to be cleared, deepened, or straightened, and estimate the cost of each, and shall also estimate the probable cost of maintaining the same for a year, and proceed to make his report thereon to the court. In locating canals and ditches, the engineer shall, in so far as the same may be practicable, follow the lines of the land, where it has been sectionized, and his report shall be accompanied by a map showing the initial or beginning point, as well as the outlets of all canals, ditches, etc., as provided by law."

The engineer, George F. Horton, as a preliminary to the location of the drainage ditches, and outlining the work to be done, undertook to locate and define the outside boundaries of the district. In doing so, according to his report, he found that the line along Clear creek which, according to the petition, called to run to a point on said creek which would afford sufficient good drainage, after crossing the Gulf, Colorado & Santa Fé Railroad, had to be extended several miles below such crossing, and to the track of the G., H. & H. R. R. before a point could be reached that met these requirements. He also found that a line running northwardly from this point to the summit of the divide between Sims and Brays bayous could not be run to parallel

the Gulf, Colorado & Santa Fé Railroad, as called for in the petition; that such a line, if run parallel with said railroad, would run to the eastward of the mouths of both of said bayous where they emptied into Buffalo bayou; and that in order to reach the point called for as the summit of the divide between Brays and Sims bayous, from the aforesaid point on Clear creek, the line would have to incline slightly towards the Gulf, Colorado & Santa Fé Railroad. The engineer further reported that the divide between Brays and Sims bayous, as understood by him, was found to lie for the most part along the track of the Galveston, Harrisburg & San Antonio Railway, and that he followed this line as the dividing line between the watersheds of the two bayous to the Ft. Bend county line. The engineer in his report embodied a specific and definite description of the boundaries of the district, accompanying his report with a topographical map, showing the contour of the land, and the location of the drainage ditches, and containing other data as required by section 7 of the act. Upon the filing of the report an order was made by the commissioners' court setting the same down for hearing on October 26, 1908, as required by section 10 of the act, and the clerk was required to cause to be posted the notices required by law. The notices were accordingly posted, as shown by the return of the deputy clerk duly sworn to, at the same places at which the notices of the initial petition had been posted. The hearing upon the engineer's report was postponed to December 4, 1908, when an order was made approving the report, and on the same date the court made an order ordering an election to be held on Monday, January 25, 1909, in the proposed drainage district, as required by section 12 of the act. In this order the boundaries are set out as embraced in the engineer's report, the voting places are designated, and the officers to hold the election are named, and notices ordered to be posted as provided by law. Notices were posted accordingly, one at the courthouse door, and five at public places in the proposed district; four of them being the same heretofore mentioned, and the fifth being the depot at Almeda. The election was held, with the result that 61 votes were cast, of which 52 were for and 9 against the creation of the district and issuance of bonds and levy of tax. On February 10, 1909, the commissioners' court met, canvassed the returns, and declared the result as aforesaid, and declared the district created under the name of Harris county drainage district No. 2, giving the boundaries thereof as embodied in the engineer's report. At the same term of the court three commissioners were appointed as provided by the act, who duly qualified as such. Thereafter, on March 10th, an order was duly made authorizing

the issuance of bonds of said drainage district to the amount of $200,000 in denominations of $1,000 each, to run 30 years, redeemable at the option of the district in 20 years. By the terms of the order provision was made for the levy of the necessary tax annually to pay interest and provide a sinking fund as required by law.

It was alleged by defendants in their pleadings, and was established by the undisputed evidence, that thereafter on June 23, 1909, with the approval of the county judge, a contract was entered into by the drainage commissioners with Kinnear Bros., who came in as defendants, for the construction of drainage ditches, opening of streams, and other work necessary to put in operation said scheme of drainage. The contract price of the work was $150,531. Kinnear Bros. were to buy at par and accrued interest $165,000 of the bonds of the drainage district. For $10,000 of said bonds to be issued to them they were to pay cash, and the remainder of the bonds were to be delivered to them in payment of the work as it progressed. They gave bond for the performance of the work. At the time of the institution of this suit, the $10,000 of said bonds had been delivered and paid for, and in addition $25,000 thereof had been delivered for work performed. These bonds had been by them sold, being the bonds referred to in the court's charge. The entire issue of bonds was approved by the Attorney General and registered by the Comptroller as provided by law.

The grounds of relief set out by plaintiffs were based upon alleged failure to comply with the provisions of the act in question in the organization of the drainage district. It was urged that the proceedings leading up to the creation and organization of the district and the issuance of bonds, levy of taxes, etc., were void for the following reasons: First. The initial petition was not signed by 25 of the freehold resident citizens, taxpayers in the proposed district, nor by one-third of such freehold resident citizens, taxpayers whose lands are affected thereby, as required by section 2 of the act. Second. That the proposed boundaries of the district as set out in the petition were so vague and indefinite and uncertain as not to give sufficient notice to the citizens who might be interested of the extent of such boundaries so as to enable them, and especially plaintiff Allen, to determine whether any of their lands were included therein. Third. That the engineer, Horton, without authority of law, by his survey, extended the boundaries of the proposed district far beyond the boundaries set out in the petition, and arbitrarily and without authority of law changed said boundaries with the effect to include in said district about 5,000 acres of Allen's land, of which not more than 300 acres would have been included in the boundaries of the dis-

trict as set out in the petition, and that these changed boundaries had been adopted by the commissioners' court as the boundaries of the district as established, without authority of law, and contrary to the express provisions of the act. Fourth. That the notices of the filing of the petition, of the engineer's report, and of the election, were not posted in four public places in the district as provided by law, and were not so posted as to give reasonable notice to plaintiffs, and especially Allen, who lived remoté from either of the places at which said notices were posted, of the movement to have said district created.

Upon each and all of said grounds, it was contended that the commissioners' court acted without lawful authority in the creation of such district, and that their action was void, and that the creation of the district including their lands, and the levy of taxes thereon for payment of the aforesaid bonds, were in violation of the provisions of the federal and state Constitutions prohibiting the taking of property without due process of law, and that they have no adequate remedy for their protection except that herein prayed for, by injunction.

These several contentions of plaintiffs were denied by defendants, who, both by plea and exceptions, contended that the boundaries as set out in the petition were as certain and definite as was necessary to give the court jurisdiction and to give notice to owners of land in the proposed district; that if certain of the signers of the petition were shown not to be resident freehold taxpayers, at any rate, the petition was signed by at least one-third of such citizens in the district. It was denied that the engineer had changed the lines of the district to any material extent, but had only by his survey made the boundaries conform to the calls in the petition according to the rules of surveying, and it was further averred that the notices had been posted in strict accordance with the requirements of the statute. It was further contended by the defendants, both by plea and exceptions, that the said drainage district was a municipal corporation, and that the validity of the creation and organization and existence of it as such could only be attacked by a proceeding in the nature of quo warranto, at the suit of the state, and further that the question of the regularity of the proceedings, from the filing of the petition to the final action in the creation of the district, had been determined by the commissioners' court, which body was by law vested with the exclusive right and jurisdiction to determine such matters, and that the validity of the creation of the district could not be collaterally attacked, as was sought to be done in the present case, on account of any of the matters here urged by plaintiffs as grounds for relief. Defendants further pleaded that each of the plaintiffs was estopped to question the validity of the proceedings by reason of the facts that with full knowledge of the proceedings, and that their lands were included in the district, they had stood by and allowed the various steps to be taken, the contract for work to be entered into, the bonds to be issued and a large portion thereof disposed of, and large expenditures incurred for work, without making known any objection thereto, and they should not be allowed now to disrupt and destroy the district, as would be done if the relief prayed for was granted. It was also averred by defendants that if there was any irregularity in the proceedings to create and organize the drainage district, or in the issuance of the bonds, that such defects had been cured by section 1, c. 13, Acts 31st Legislature, and also by section 24, c. 118, Acts 32d Legislature.

The only issue of fact presented by the evidence arises upon the plea of estoppel as to Sam Allen. As to the other three appellants, W. H. Parker, J. C. Parker, and Morgan Davidson, the undisputed evidence showed that each of them had actively participated in the organization of the district, and their lands all lay west of the Santa Fé Railroad, and unquestionably within the limits of the district as embraced in the initial petition under any possible construction thereof. The evidence as to the knowledge of Allen of the proceedings to create the drainage district, or at least of the fact that it included his lands, upon which the claim of estoppel was based, was conflicting. Allen himself denied any such knowledge that the district included his lands until he was called upon to pay the taxes for 1909, a short time before the suit was filed. Several witnesses testified to certain facts which inevitably fixed upon Allen actual knowledge or notice of the proceedings and of the fact that the proposed drainage district included all of his lands now included therein, as early as August or October, 1908. This testimony was vigorously and emphatically contradicted by Allen.

[1] There was a clear conflict in the evidence, which it was the province of the jury to decide. They decided it against appellant Allen under the charge of the court on the issue of estoppel, and in deference to such verdict we find as a conclusion of fact on this issue that Allen had actual knowledge of the proceedings, and of the fact that the proposed district took in all of his lands at the time stated.

No contention is presented by any of the assignments of error, nor by the pleadings of appellants, that the act of 1907, under which the drainage district was organized and the bonds issued, is in any of its provisions obnoxious to any provision of the state or federal Constitutions, nor that the act does not afford due process of law by which

appellants' property is invaded for the purpose of carrying out the work of drainage and levying and collecting the taxes, if its provisions had been complied with. The contention presented by the pleadings and by the briefs is that the departure from those provisions, in the several particulars heretofore stated, operated to deprive them of the protection of that due process of law without which their rights could not be invaded and their property taken, as is sought to be done in the organization of the drainage district, and the imposition of the special taxes aforesaid.

We think it will be more satisfactory to dispose of these several contentions of appellants without strict regard to the form in which they are presented by the several assignments of error. Suffice it to say that they are all presented by proper assignments. Appellees' case is also presented by cross-assignments of error as well as counter propositions to appellants' assignments. The propositions advanced both under the assignments of error and the cross-assignments present the whole case as hereafter discussed.

[2] Taking up the proceedings in the order in which they occurred, and appellants' objections thereto, appellants attack the petition for the drainage district, which is the foundation of the court's jurisdiction, on the ground that it does not "set forth the proposed boundaries" of the district as required by section 2 of the drainage act. The boundaries are thus set out in the petition: "Beginning at the common corner of Brazoria, Ft. Bend, and Harris counties; thence eastwardly along the boundary line between Brazoria and Harris counties to such a point on Clear creek as will afford sufficient good drainage after crossing the track of the Gulf, Colorado & Santa Fé Railroad; thence in a northerly direction parallel with the said railroad track to the summit of the divide between Sims bayou and Brays bayou; thence westwardly along the summit of the divide following the meanders of the same to the line between Harris and Ft. Bend counties; thence southeastwardly along said line to the beginning."

[3] This description is undoubtedly subject to the criticism that a survey should have been made by the petitioners before the preparation of the petition so as to make more definite and certain the point on Clear creek which would afford sufficient good drainage, and also the call for the summit of the divide between Sims bayou and Brays bayou, and thus have more accurately given notice to those owning lands in the eastern part of the proposed district, including Mr. Allen, to what extent their lands were included; but we do not think it is so indefinite and uncertain as not to afford a proper basis for the court's action, and to invalidate the subsequent proceedings. The statute provides that the posted notices should consist of certified copies of the petition and the order of the court. We do not understand appellants to contend that the posting of notices in compliance with the statute containing sufficiently definite and certain designation of the boundaries of the proposed district to afford Allen notice that it included his lands would not have been all the notice that the due process of law referred to in the Constitution entitled him to. Looking to the petition, it certainly appeared that the line on Clear creek would extend down the creek beyond the crossing of the Santa Fé Railroad for some distance, and might extend far enough to include all of his lands included in the district as organized. An examination of the maps in evidence shows that the Blas Herrera and Prentiss surveys, in which most of Allen's lands lie, abut on the Santa Fé Railroad on the east, and that the John Harris survey, in which the remainder of his lands included in the district lie, adjoins the Prentiss on the east. It would have been perfectly clear to any one reading the petition that if the line was extended down Clear creek after crossing the Santa Fé Railroad any appreciable distance to reach the point called for which afforded sufficient good drainage, the district as thus laid out would take in some of Allen's land on the Blas Herrera and Prentiss, and that this line would have had to be extended a comparatively short distance to take in all of the Herrera, Prentiss, and Harris surveys. Inasmuch as the physical facts on the ground, of the character of the stream, according to the undisputed evidence, showed that the first point on the creek, after crossing the Santa Fé Railroad, which complied with the requirements of the petition, was many miles down the creek, at a point from which a line running northwardly parallel with the railroad would lie some distance, probably several miles, east of any of Allen's lands, it seems entirely clear to us that such description as was contained in the petition was sufficient to give notice to Mr. Allen that it included his lands. According to the undisputed evidence, the summit of the divide between Brays and Sims bayous, whether located according to the ideas of the surveyor Horton or those of appellants' witnesses, lay north of Mr. Allen's lands. The description of the boundaries in the petition, we think, was sufficiently definite and certain not only to afford a basis for the court's action, but to give notice to Mr. Allen that it certainly included a good part of his lands, and probably included all of them. An accurate description of the boundaries was not required. It was only necessary that the description be sufficiently definite to give notice to owners of land in the proposed district that their lands were so included. Spahr v. Schofield, 66 Ind. 168; People v. Barnes, 193 Ill. 620, 62 N. E. 207.

The next call, from the point on Clear

creek northwardly parallel with the Santa Fé Railroad to the summit of the divide between Brays and Sims bayous, was sufficiently definite, unless it be a fact that it was rendered too indefinite by the indefiniteness of the location of this divide. When we consider the purpose of the creation of the district in connection with the topography of the country, indicating the purpose to be, by a system of drainage ditches, to carry the water falling on the territory proposed to be included into Clear creek and Sims bayou, and by clearing these streams from obstructions to conduct the water away from this territory, it would seem that no one could fail to understand that this divide between the two bayous was intended to be the line between the watersheds of the two bayous; that is, where the water falling to the north ran off into Brays bayou and that falling to the south into Sims bayou. This would afford a much more scientific boundary for the district than any line that could be accurately described without a careful and scientifically made survey. That such a survey would be necessary to accurately locate and define this line with mathematical certainty does not require that it should have been so run, located, and defined before a petition could be filed for the creation of the district with this boundary, unless it can be said that such was necessary to give Allen notice that his lands were included in the proposed district. This was not the case, in our opinion.

It is further insisted by appellants that the petition was not signed by 25 resident freehold taxpaying citizens, and that this was necessary to give the court jurisdiction to proceed. The facts in regard to this are as follows: The petition was signed by 31 persons who styled themselves freehold resident citizen taxpayers of this proposed district, and who state that they comprise at least one-third of all the freehold citizen taxpayers within its boundaries. The evidence does not show how many of such voters there are in the district. At the election held there were 61 votes cast. Over the objection of appellees, evidence was introduced which showed that of the 31 signers 10 were not resident freehold citizen taxpayers of the district. The objection was that the finding of the commissioners' court was conclusive on the question. This question will be disposed of later. It cannot be said that the 21 remaining signers did not constitute one-third, or the requisite number of such voters. The act in question requires the petition to be signed by 25 of the freehold resident citizen taxpayers, or in the event there are less than 75 of such citizen taxpayers in the district, then by one-third of such taxpayers whose lands will be affected.

[4] The next contention of appellants is that the notices of the hearing of the petition, of the hearing of the engineer's report, and of the election were not posted as required by the act; that they were not posted at such places as to give to those living in the district east of the Santa Fé Railroad, and especially to appellant Allen, reasonable notice of the proceedings. Over the same objection that was urged to the admission of evidence with regard to the signers of the petition as aforesaid—that is, that the commissioners' court were made by the act exclusive judges of the matter—the following evidence was introduced: "It was testified that Almeda was about 18 or 19 years old and was a railway station on the Tap Railroad in the extreme eastern part of the district. At the time the district was inaugurated in 1908, there were only about three or four families right in the vicinity of the station, that is, within a quarter of a mile of it; within a half mile of the station there is but one more family. Mr. Nelson Parker lived there, so did Mr. A. L. Parker, commissioner of the district. Mr. Birdsall lived within a quarter of a mile of the store or depot. Mr. G. D. Anderson lives about two miles west of the store and Almeda. Mr. Frank Treadwell lives in the district north of Almeda about two miles. Mr. Pat Johnson lives about one mile south of the store and Almeda. Mr. A. P. Johnson lives about a mile and a quarter north of the store and Almeda. Mr. Ingersoll lives in Almeda about a mile south of the store. The schoolhouse at Almeda and the depot in the town of Almeda are about a half mile apart. The witness W. H. Parker lived in Almeda. The town of Almeda is not incorporated. There was at one time a fence around it, including some 200 acres, and at that time they called that settlement Almeda. On January 25, 1909, within a mile of the post office in every direction, including barns and everything, stores, post offices, residences, and schoolhouses, there were only four residences. Within a radius of two miles in every direction around the post office, including the residences, stores, schoolhouses, and similar buildings, there were at the time of the organization of the district, and are now, quite a number of houses, from 12 to 15. A man who lives anywhere in the nieghborhood of Almeda is spoken of generally as living at Almeda. It was just a little country settlement. When the district was being organized, Mr. C. G. Patton lived at Erin, which place is also known as Mykawa. The depot at Erin is in an old box car which has been set off on the side of the track of the Gulf, Colorado & Santa Fé Railway, on the right of way of the Santa Fé. The schoolhouse at Erin is distant about 150 yards west of the box car in the same town. The post office at Erin is east of the Santa Fé Railroad, and is probably 200 yards distant east of same. The town of Erin is not incorporated. There is a store at Erin near the railroad. On January 25, 1909, and within the four or five months immediately following, within a

radius of a mile of the railroad station at Erin, there were about five or six houses, and within two miles in every direction of the railroad station there were about five or six more. A man who lives anywhere in the neighborhood of Erin is generally spoken of as living at Erin. It is a little country settlement." The objection to this evidence was at first sustained, but afterwards it was admitted, pro forma, in order to make a complete record for this court.

The act in question requires the notices called for to be posted at the courthouse door of the county, and at four other public places within the drainage district. What it takes to constitute a public place is not attempted to be defined. It depends, to a large extent, upon local conditions. We have several statutes calling for the posting of such notices. We have not been cited to any decision in this state, nor have we been able to find any, upon the question as to whether there can be more than one such public place in the same town, village, or country settlement, within the purview of the statute. The two cases from the Supreme Court of Louisiana cited by appellees, Vincent v. Sanford, 5 La. Ann. 560, and Fox v. Tio, Executor, 1 La. Ann. 335, seem to be in point and to sustain appellees' contention on this point.

Independently of the judgment of the commissioners' court upon the matter, as to which more hereafter, we are unable to say that the notices as posted were not such as to give reasonable notice to all persons interested of the pendency of the proceedings.

What has been already said is sufficient to show our views as to the objection that the surveyor arbitrarily and without authority extended the boundaries of the district beyond that contemplated by the signers of the petition, and that the petition afforded no authority to the commissioners' court to create the district that was finally created and organized. It results from what we have said that the surveyor merely endeavored, by an accurate survey, to define the boundaries according to the designation thereof in the petition, and to make that certain and definite which could be made so definite and certain by an accurate survey. Clearly he went with his survey no farther down Clear creek than was necessary to get sufficient good drainage, after crossing the Santa Fé Railroad. About this there is no dispute. From this point he ran northwardly to the summit of the divide between Sims and Brays bayous, as called for in the petition. If this land did not run parallel with the Santa Fé Railroad, it was because it was impossible to do so and conform to the call for the summit of the divide. The survey substantially followed the directions of the petition that the north line should follow this divide to the line of Ft. Bend county. It was necessary for the surveyor to know the boundaries in order to locate the ditches, etc., which he was required to do.

But conceding for the sake of argument the invalidity of the proceedings as claimed by appellants, appellees present another answer to the same on all of these points, and this brings us to the most important questions in the case, which are presented by cross-assignments of appellees based upon the action of the court in overruling exceptions to the petition and objections to evidence.

Broadly stated, the contentions of appellees are: First, that the drainage district as created and organized is a de facto, if not a de jure, public or quasi public corporation, and that the validity of its creation can only be attacked for irregularity in the proceedings therefor, as by a failure to comply with all of the provisions of law providing for its creation, by a proceeding in quo warranto at the suit of the state; second, that by the terms of section 3 of the act the commissioners' court is vested with exclusive jurisdiction "to hear and determine all contests and objections to the creation of such district and all matters pertaining to the same," and that having passed upon all the questions presented by the objections here made by appellants, as to the signers to the petition, the posting of notices, and the boundaries of the district, the correctness of their conclusions cannot be assailed in a collateral proceeding; and, third, that if there are such irregularities in the creation of the district as is claimed by appellants, they have been healed, and the proceedings validated (a) by the act of 1909, and (b) by the act of 1911, hereafter set out.

[5] It is provided in section 3 of the Drainage Act of 1907 that: "Said county commissioners' court shall have exclusive jurisdiction to hear and determine all contests and objections to the creation of such district, and all matters pertaining to the same, and said court shall have exclusive jurisdiction in all subsequent proceedings of the district when organized, except as hereinafter provided." The broad powers here given the court are not limited in any of the particulars pertinent to the case here presented, by any other provisions of the act. We might be prepared to admit that the power here conferred would not preclude an inquiry into the questions as to whether there was any petition for the creation of the district, or a petition with no signers, or that there was no notice at all given or attempted to be given of the various steps in the proceedings, or upon the question of the creation of a district totally different from that embraced in the petition. In such cases it might be said that the court was without power to take the first step in the proceedings, and that to impose a special burden of taxation upon the citizen or servitude upon his lands, by the creation of a district under such circumstances would be to take his property without due process of law within the meaning of the federal and state Constitutions. But that is not the case here presented. There can, we think, be no

question that the exclusive jurisdiction conferred upon the court authorized that body to determine whether the petition was void for failure to define the boundaries, w .ether it was signed by the requisite number of qualified persons, whether the notices called for during the proceedings had been properly posted, and whether the district as finally created conformed in its boundaries to that defined in the petition. If the provision referred to did not include these matters, then the broad language used must be so limited by construction as to rob it of all practical force. The exclusive jurisdiction to hear and determine all contests and objections to the creation of such district and all matters pertaining to the same does not admit of any construction so limited as to exclude the matters embraced in the contention of appellants. The only question that could be raised would be as to the constitutional authority of the Legislature to confer this, jurisdiction upon the court. If they had such powers, then the commissioners' court, in the exercise of this exclusive jurisdiction, having decided all these questions, no other court has authority to interfere with this exclusive jurisdiction. It is clear that it was intended by the Legislature that after a drainage district was once created, followed by the issuance and sale of bonds, and the expenditure of large sums of money, all questions as to the proper performance of the various steps to be taken in the formation of the district should be considered settled if the facts were such as to call into exercise the jurisdiction of the court at all. Now, what is there in this provision of the act that infringes upon .the due process provisions of the Constitution? We do not understand that any of the appellants contend that the right to a hearing, to appear and make any objections they saw fit, at every stage of the proceedings, was denied, but that by reason of want of reasonable notice, or any notice, that their rights were involved in the creation of the district to any serious extent, they were deprived of any opportunity to be thus heard. If appellants were entitled, as due process of law, to be given actual personal notice, then the entire act in question is unconstitutional and void, for it nowhere provides for such notice. It was held in Hutcheson v. Storrie, 92 Tex. 685, 51 S. W. 848, 45 L. R. A. 289, 71 Am. St. Rep. 884, following Norwood v. Baker, 172 U. S. 269, 19 Sup. Ct. 187, 43 L. Ed. 443, that a city charter which authorizes a city council to improve the streets at the cost of the owners of abutting property in proportion to frontage, without regard to special benefits to the property, is violative of section 17, art. 1, of the Constitution of this state, and the fourteenth amendment of the federal Constitution. The charter of the city of Houston authorizing the assessment of the entire cost of the street improvement upon the property of abutting owners, without regard to special benefits, authorized the property owners to call upon the city council to revise and correct errors in the assessments, and notice by publication of the roll of property owners was provided for. It was held, however, that this did not authorize any inquiry to determine the amount of the special benefits to the property, but only extended to the correction of errors in the assessment according to the only measure provided by the charter, which was according to the front-foot rule. It was therefore held that, as there was no authority in the Legislature to authorize the assessment for such improvement without regard to special benefits, and as no means were provided for a hearing as to such special benefits, the provision of the charter referred to was unconstitutional and void. If the decisions in the cases referred to have any application to the present case at all, then it follows inevitably that the drainage act of 1907 is void, for it pays no regard to the value of special benefits to lands within the district. All lands and other property in the district are taxed alike. As we have said, we do not construe the pleadings of appellants as presenting the question of the constitutionality of the act on this or any other ground. Nor can it be so declared upon the grounds discussed in the cases referred to. Oliver v. Monoma Co., 117 Iowa, 43, 90 N. W. 510.

Appellants, and especially Mr. Allen, insist with much earnestness that the posted notices were insufficient to vest the commissioners' court with jurisdiction to determine anything, and that to include their lands in the district would operate to deprive them of their property without due process of law, and support their contention with a wealth of authority, showing most diligent and painstaking investigation. ' The cases cited have all been carefully considered, and all of those relied upon are, in our opinion, clearly distinguishable, on their facts and the statutes controlling the proceedings, from the present case. It is impossible within the limits of this opinion for us to discuss even a small proportion of the cases cited. The case of Sanner v. Union Drainage District No. 1, 175 Ill. 575, 51 N. E. 857, much relied upon by appellants, was a direct appeal by certiorari from an order of the drainage board including in the district the lands of appellants. We feel justified in quoting here the following from the opinion to show the real case before the court, and that the decision is not applicable to the present case: "It would be against every principle of justice and right to allow land to be included in a district, and made subject to taxation by such inclusion, when the action of the commissioners in creating the district and including the lands therein was without notice to the owners. The notice as required by the statute goes to the right of the commissioners to act, and, unless the lands of the owners are included by their own petition, and by their request as signers, or by

having their names included in the petition as landowners by the petitioners, or by having their names appear in the notice, their lands cannot be included in the district; and they, or others whose lands are included, have the right to make an objection, for the objection goes to the entire organization. The commissioners are required to act in accordance with the provisions of the statute, and, if they fail to do so, there arises a necessity for the exercise of the common-law writ of certiorari, as that is the only method by which the legality of their action may be tested and tried. They cannot act without the petition and without the affidavits, and, if they do so, and attempt to find the boundaries of the district entirely without reference to the lands described in the petition, and without notice to the owners, the question may arise on certiorari, where they so proceed illegally, and there is no appeal or other method of reviewing the proceeding."

Appellants also rely strongly upon the case of Payson v. People, 175 Ill. 267, 51 N. E. 588, by the same court; the opinion being by the same judge as in the Sanner Case. A careful consideration of the opinion will show that it is inapplicable to the present case. We think this will appear sufficiently from the following quotation from the syllabus, which shows the character of the proceeding: "On application for judgment on a delinquent special assessment of a drainage district against land of a nonresident, any power to make the assessment being derived from a proceeding to organize the district under a statute requiring mailing of notices to nonresident owners (Drainage Act, par. 3), it may be shown that the owner of the land was a nonresident, and received no notice, and that therefore the court had no jurisdiction to include the land in the district, or confirm the assessment."

We cannot extend this opinion to the length that would be necessary for a discussion of the cases cited. They all present either cases arising under statutes expressly providing for the inclusion of lands only when special benefits to such lands from such inclusion are shown, and assessments levied only in proportion to such benefits, a hearing as to such benefits being provided, or cases of direct attack upon the regularity of the proceedings creating the district and generally provided for in the statute. In the present case we have the direct provisions of the statute giving the commissioners' court exclusive jurisdiction "to hear and determine all contests and objections to the creation of the district and all matters pertaining to the same." We cannot doubt, without giving a construction to the language used of which it is not susceptible, that having proceeded to create and organize the district, the commissioners' court has, in the exercise of the exclusive jurisdiction here given, determined that the notices were

posted at four public places in the district, that the petition was signed by the requisite number of qualified persons, that the petition sufficiently described the boundaries, and that the district, as created, substantially conformed, in its boundaries, to the district set out in the petition. Therefore, so far as this collateral attack on the district is concerned, these questions must be considered as finally settled. 14 Cyc. 1051, and cases cited in note 83; State v. Wilson, 216 Mo. 215, 115 S. W. 568; Tulare Irrigation Dist. v. Shepherd, 185 U. S. 1, 22 Sup. Ct. 531, 46 L. Ed. 773; Anderson County v. I. & G. N. R. R. Co., 52 Tex. 228; Graham v. Greenville, 67 Tex. 63, 2 S. W. 742.

[6] The trial court held that the action of the commissioners' court in creating the drainage district could only be questioned in a direct proceeding in quo warranto at the suit of the state. There can be, we think, no question that drainage districts organized under the act in question are public, or quasi public, corporations. 14 Cyc. 1026; Fallbrook v. Bradley, 164 U. S. 112, 17 Sup. Ct. 56, 41 L. Ed. 369; People v. La Rue, 67 Cal. 526, 8 Pac. 84; People v. Williams, 56 Cal. 647.

[7] It is a firmly established doctrine that when the law provides for the creation of such districts by the action of any public body, as the commissioners' court in the present drainage law, the validity of such action in the creation and organization of such districts cannot be questioned except by a direct proceeding in quo warranto, at the suit of the state, for mere irregularities in, or failure to comply with, the prescribed procedure. 14 Cyc. 1029; Graham v. Greenville, 67 Tex. 62, 2 S. W. 742; El Paso Co. v. Ruckman, 92 Tex. 88, 46 S. W. 25; Tulare Irrigation Dist. v. Shepherd, 185 U. S. 1, 22 Sup. Ct. 531, 46 L. Ed. 773; Blake v. People, 109 Ill. 511; Keigwein v. Combs, 115 Ill. 347, 5 N. E. 576; Osborne v. People, 103 Ill. 227; Payson v. People, 175 Ill. 267, 51 N. E. 589.

It was held by the Supreme Court, in the late case of Parks v. West, 102 Tex. 11, 111 S. W. 726, that this rule is limited to such corporations as might legally exist, and did not apply to one attempted to be created under a law which was unconstitutional, distinguishing El Paso v. Ruckman and Graham v. City of Greenville, supra. But the doctrine announced in that case can have no application to the present case, where the attack is not based upon any want of constitutional authority in the Legislature to provide for the creation of such districts, but solely upon a failure to comply with the various steps required to be taken in the proceedings. We think this is sufficiently clear from the opinion, and it has been so held by the Court of Civil Appeals of the Fifth District in Crabben v. Celeste Independent School District, 132 S. W. 890, and by the Court of Civil Appeals of the Second District in Coffman v. Goree Ind. School

Dist., 141 S. W. 132. It was never intended by that decision to overrule the practically unanimous decisions of the courts of this and other states, and of the Supreme Court of the United States, a few only of which have been cited. If this be true, we cannot understand how appellants can be allowed to take their lands out of the district upon the grounds here urged. The same objections could be urged by any landowner in the district with the effect of destroying it utterly.

[8] The Thirty-First Legislature, at its regular session in 1909, passed an act amending the drainage law of 1907. Chapter 13, Acts 1909. A proviso to section 2 of the act is as follows: "Provided, however, that in all cases wherein drainage districts have heretofore been established, or wherein a hearing has been heretofore had on the petition, and action thereon has been taken by the county commissioners' court, or wherein a public hearing is now pending upon a petition for a drainage district, and the notices thereof and therefor have been so posted for twenty days, in either or all of such cases, the notices for such public hearing as well as the notices for the hearing upon the engineer's report provided for in section 10 of this law, shall be and they are hereby held, deemed and declared to be and to have been due and legal and valid notices of such public hearing or hearings under the full meaning, intent and purpose of this law." This act went into effect February 19, 1909. All of the proceedings in the creation of the district in this case up to and including the holding of the election and declaring the result were had previous to the passage of this act. We think there can be no question that the effect of this act was to cure whatever irregularities there may have been in the posting of the notices referred to, in so far as the Legislature had constitutional authority so to do. That such was the purpose is clearly shown by the emergency clause of the act.

The Thirty-Second Legislature in 1911 passed another drainage law, which was a substitute for the act of 1907, and incorporated therein the following provision: "Provided, however, in all drainage districts heretofore created, and which have issued and registered bonds with the Comptroller, and under chapter 40 of the Acts of the Thirtieth Legislature of Texas, approved March 23, 1907, and by Acts of Thirty-First Legislature, chapter 13, House Bill No. 89, that all proceedings had and done in connection with and leading up to the creation of such districts and the issuance of such bonds so registered except such bonds that were issued and registered with the Comptroller under chapter 40 of the Acts of the Thirtieth Legislature of Texas in excess of the estimate before the commissioners' court, when the election was ordered and held, be and the same are hereby held, deemed and declared to be, and to have been regular, valid and legal proceedings under the full, intent, purpose and meaning of this law; and all such bonds so issued thereunder are hereby held, deemed and declared to be valid and binding obligations upon such drainage districts." Prior to the enactment of this law, all of the proceedings herein complained of had been had, the bonds had been issued, approved by the Attorney General and registered by the Comptroller, the contract for drainage entered into, and bonds delivered and sold and expenses incurred, as hereinbefore set out. If the Legislature had the constitutional right to do so, this provision effectually cured every defect and irregularity in the proceedings herein urged, as a basis for relief by appellants. Conceding that in the various particulars complained of the commissioners' court failed to comply with the provisions of the drainage act, if the Legislature had the power to authorize in the first instance the creation of such districts in the manner in which this district was created, then it could by subsequent legislation validate such proceedings and thus cure the alleged defects.

[9] The rule is thus stated by Judge Cooley, in his work on the Principles of Constitutional Law (page 325): "It is said to be a general rule that it is competent for the Legislature to give retrospectively the capacity it might have given in advance, and to dispense retrospectively with any formality it might have dispensed with in advance." The general doctrine seems to be well settled. Morris & Cummings v. State, 62 Tex. 739; Nolan County v. State, 83 Tex. 182, 17 S. W. 823. In the latter case it is said that the question can hardly be deemed an open one in this state. See, also, Ritchie v. Franklin County, 22 Wall. 67, 22 L. Ed. 825; Jonesboro v. Cairo R. R. Co., 110 U. S. 192, 4 Sup. Ct. 67, 28 L. Ed. 116; Blake v. People, 109 Ill. 526.

[10] The question remains: Did the Legislature have the authority in the first instance to authorize the creation of the district in the manner in which this district was created, as to notices, changes in boundaries, etc., as alleged by appellants. The objection urged here to the exercise of such power is that its exercise would have been in violation of the due process of law provisions of the federal and state Constitutions. Without extending this opinion by a further discussion of this question, we think that the cases cited below support the conclusion that the Legislature had the authority to create by legislative act, or to authorize the creation and organization by the commissioners' court, of drainage districts, without notice at all, certainly upon such notice as was given in this case, and that, if in fact the commissioners' court, by the adoption of the boundaries set out in the engineer's report,

changed the boundaries of the district from those embraced in the petition, the Legislature could, in the first place, have authorized such action. Drainage Amendment to the Constitution, Acts 1903, p. 246; Graham v. Greenville, 67 Tex. 62, 2 S. W. 742; Fallbrook Irr. Co. v. Bradley, 164 U. S. 112, 17 Sup. Ct. 56, 41 L. Ed. 369; French v. Barber, 181 U. S. 324, 21 Sup. Ct. 625, 45 L. Ed. 879; Hagar v. Reclamation Dist., 111 U. S. 701, 4 Sup. Ct. 663, 28 L. Ed. 569; Oliver v. Monona Co., 117 Iowa, 43, 90 N. W. 510.

[11] We cannot agree that, in any view to be taken of the facts of the present case, and as to any of the appellants, that the effect of the proceedings complained of would be to deprive them of their property rights or privileges without due process of law. As to the effect of the validating acts, appellants present the contention that granting the power of the Legislature to create this drainage district by legislative act, such act would be a special law within the meaning of section 57, art. 3, of the Constitution, and that any validating act with reference thereto would likewise be a special law, and could only be enacted with the formalities as to publication of notices thereof prescribed by the section of the Constitution referred to. The validating acts referred to apply by their terms to all drainage districts, and the proceedings with regard to their creation, theretofore created. They are in no sense special laws, and the provisions of the section of the Constitution referred to have no application.

[12] We have endeavored to dispose of all of the questions presented by the assignments and cross-assignments of error. The subject is a large one, and the questions presented are important. We have been greatly assisted by the very able and exhaustive briefs and arguments of counsel on both sides. We are comforted by the thought that, if we are in error in any of the conclusions reached, such errors can and will be corrected by the Supreme Court. As will be seen, we do not base our final conclusion, that the judgment of the district court should stand, upon the finding of the jury upon the issue of estoppel. If the result of the proceedings would be to deprive appellants, or either of them, of their property, to impose upon their lands a special burden or servitude, without due process of law, within the meaning of that term as used in the federal and state Constitutions, none of the appellants would be estopped to seek the relief here sought, by the facts urged by appellees under their plea of estoppel. This, we think, is expressly decided by the Supreme Court in Hutcheson v. Storrie, 92 Tex. 697, 51 S. W. 848, 45 L. R. A. 289, 71 Am. St. Rep. 884.

We have carefully considered the assignments of error directed to the remarks of counsel for appellee in his speech to the jury.

We cannot believe that they had any influence upon the jury in arriving at a verdict upon the only issue submitted to them. They do not afford any ground for a reversal of the judgment, and the assignment is overruled.

Our conclusion is that none of the assignments of error presented by appellants afford any ground for reversal, and the judgment, for the reasons given, is affirmed.

Affirmed.